Russell Forkey, Ft. Lauderdale, Fla., for plaintiff.

Patricia Cowart, Miami, Fla., for defendants.

**Selma BOYD, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and James B. Davis, Defendants.**

**No. 84–6735–CIV.**

United States District Court, S.D. Florida, N.D.

July 25, 1985.

ORDER

GONZALEZ, District Judge.

On June 18, 1985, 611 F.Supp. 218, the court denied defendants' motion to dismiss the amended complaint, and reserved ruling on defendants' motion to compel arbitration pending the submission of documentary evidence by the parties regarding fraudulent inducement, unconscionability or lack of mutuality of the arbitration agreement. (docket # 34) The court instructed plaintiff to file any additional affidavits or other proof in support of its position with regard to arbitration, and then accorded defendants time to file a legal response of their own.

Plaintiff and her physician subsequently filed affidavits (docket # 35), whereupon defendants moved for a rehearing of the June 18th order and also filed their legal response as required by that order (docket # 36).

Defendants argue in their motion for rehearing that the court need not entertain additional evidence because the issues of fraudulent inducement, unconscionability and lack of mutuality should be determined by the arbitrator. The defendants are of course correct to the extent that any of these issues do not go to the validity of the arbitration clause. The law is reasonably clear, however, that in reviewing a motion to compel arbitration, a trial court must distinguish between the validity of the

overall agreement and the arbitration provision.

The Fifth Circuit recognized this distinction in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 637 F.2d 391 (5th Cir.1981). The plaintiff there argued that the district court denied her due process when it ordered arbitration of the securities claims despite plaintiff's allegations that the customer agreement was unconscionable and that she had signed it under duress. The court of appeals rejected plaintiff's argument, reasoning that "[h]er claims regarding duress and unconscionability are ones that, in the event of arbitration, would be decided by an arbitrator, not the district court, *since they go to the formation of the entire contract rather than to the issue of misrepresentation in the signing of the arbitration agreement." Id.* at 398 (citing *Prima Paint Corp. v. Flood & Conklin,* 388 U.S. 395, 406, 87 S.Ct. 1801, 1807, 18 L.Ed.2d 1270 (1967) ) (e.s.). Footnote 11 of the court's decision is equally revealing:

> [Plaintiff's] allegations that she signed the stock option agreements under circumstances of coercion, confusion, undue influence and duress *are related to her reasons for signing the contract as a whole, but are not directly related to the signing of the arbitration clauses* per se.

637 F.2d at 398 n. 11 (emphasis added). *See also Wick v. Atlantic Marine, Inc.,* 605 F.2d 166, 168 (5th Cir.1979) ("If, in fact, the arbitration clause was induced by fraud, there can be no arbitration....").

True to this legal precept, the court's June 18th order offered plaintiff an opportunity to demonstrate fraud in the inducement of the arbitration clause.[1] Plaintiff introduces her own affidavit along with that of her physician in support of her claim that defendants fraudulently induced

her into agreeing to the arbitration provision. *See* Plaintiff's Affidavits, Appendix A, attached. After reviewing those affidavits, the court finds that they fail to state a claim for fraudulent inducement.

The gravamen of a fraudulent inducement claim is that the person on whom one relies causes another to consent to a contract or a particular provision therein by some affirmative act of deceit. That deceit may take the form of material misrepresentations of fact with respect to the subject provision, or failure to state facts whose omission makes the statements made misleading.

Plaintiff does not allege that defendants made any misrepresentations of fact with respect to the arbitration clause. Rather, she asserts that defendants omitted to tell her about the existence and effect of the arbitration provision. Viewed in isolation, this omission does not rise to the level of fraudulent inducement, because each party to a contract bears responsibility for inquiring about any provision not understood prior to executing the agreement. Fraudulent inducement requires by definition that one party *induce* another to do something or forebear from doing something. A party's failure to explain a contractual provision to another does not invalidate the clause unless the relying party can demonstrate that the other's silence is misleading in view of his statements and actions.

■ Plaintiff's proofs, however, cannot be viewed "in isolation," for her affidavits suggest that she could not have inquired about the arbitration clause, or was tricked into agreeing to its inclusion in the account agreement, because she "was taking certain hypnotic drug(s) for chronic insomnia." These drugs, explains plaintiff's physician could possibly have impaired her memory, caused her confusion, and enabled others to

---

1. Defendant is correct that plaintiff cannot prevent arbitration by demonstrating lack of mutuality or unconscionability of the account agreement. *Prima Paint Corp.* and its progeny, including *Mercury Construction,* all recognize that the decision whether a contract is invalid due to lack of mutuality or unconscionability is to be

made by the arbitrator and not the court. Defendant's motion for rehearing on the June 18th order is thus granted to the extent indicated above. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 637 F.2d 391, 398 (5th Cir.1981).

easily manipulate or induce her to commit an act since her inhibitions were reduced. Despite plaintiff's condition, however, she offers not a shred of evidence to prove that defendants knew or should have known of her condition. Plaintiff also fails to allege or provide affidavits to prove that defendants failure to explain the arbitration clause was misleading in view of defendants other statements about the account agreement. There is, therefore, no reason to believe that defendants had a duty to explain the account agreement chapter and verse.

■ The court's interpretation of the facts herein is consistent with general legal principles. One's failure to read a contract before signing it does not render the instrument unenforceable unless the complaining party can demonstrate that he either is prevented from reading the document, or is induced by statements of the other party to refrain from reading it. *See Allied Van Lines v. Bratton*, 351 So.2d 344, 347–48 (Fla.1977); *All Florida Surety Co. v. Coker*, 88 So.2d 508, 510–11 (Fla. 1956); *Alejano v. Hartford Accident & Indemnity Co.*, 378 So.2d 104, 105 (Fla. 3rd Dist.Ct.App.1979).

In the final analysis, plaintiff's failure to read the arbitration clause was not due to defendants' misrepresentations. There simply is no evidence to support that position. The court is left with a customer who did not examine the arbitration clause because she did not want to or did not know better. Under these circumstances, the plaintiff cannot be heard to complain about the arbitration provision. The law is clear that a party cannot be excused from a contract that she has signed simply because she failed to read or understand its terms by her own doing. *See St. Petersburg Bank Trust & Co. v. Boutin*, 445 F.2d 1028, 1032 (5th Cir.1971). What contracts could withstand judicial scrutiny if that were not the standard?

The Fifth Circuit confirmed this view in *Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 720 F.2d 1446 (5th Cir.1983). The plaintiff there was a Merrill Lynch customer who sued the brokerage house and one of its agents for violations of the securities laws. The district court subsequently ordered arbitration, and plaintiff appealed, arguing, *inter alia*, that arbitration was not available because a Merrill Lynch representative fraudulently induced Greenhaw to sign the arbitration agreement. The appellate court categorically rejected plaintiff's argument.

> [Greenhaw's] argument is spurious. [The company] asserts that Merrill Lynch marked with an "X" the line on which to sign this agreement, thus preventing Greenhaw from discovering that the arbitration agreement was voluntary and was not a condition of opening a commodity account with Merrill Lynch.
>
> ... If Greenhaw signed the arbitration agreement without reading it, that careless act does not make the agreement any less binding. Merrill Lynch's act of placing an "X" next to the place where the customer was to sign does not rise to the level of coercive conduct required to invalidate a contract.

*Id.* at 1450–51.

Two points about *Smoky Greenhaw* should be noted. First, although the court writes in terms of an "arbitration agreement," when read in context it is clear that its discussion pertains to the arbitration clause. *See* 720 F.2d at 1450 n. 8 and accompanying text. Second, the court emphasized that the arbitration clause conformed with federal regulations and was sufficiently obvious as to put a reader on notice of its existence and terms. The arbitration clause in this case, Appendix B, attached, like that in *Smoky Greenhaw*, passes regulatory muster[2] and also is suf-

---

**2.** The account agreement containing the arbitration clause does not violate 17 C.F.R. § 240.-15c2–2, Appendix C, attached, because it was executed before December 28, 1983 and is otherwise consistent with that section.

ficiently conspicuous as to put a customer on notice of its content.[3]

Based on the foregoing, the court concludes that defendants did not fraudulently induce plaintiff into agreeing to the arbitration clause. Accordingly, it is ORDERED AND ADJUDGED that Counts II (§ 10(b) of Exchange Act) and III (breach of fiduciary duty) be subject to arbitration immediately. The court requests that the parties advise it whether they intend to litigate simultaneously Count I (§ 12(2) of the Securities Act) or stay that aspect of this proceeding pending the outcome of the arbitration.

## APPENDIX A

### AFFIDAVIT

BEFORE ME, the undersigned authority personally appeared SELMA BOYD, who after being duly sworn deposes and states as follows:

1. I am the Plaintiff in the above-styled cause of action.

2. I opened the account with the Defendant, MERRILL LYNCH, at the recommendation of my bank manager at Flagship Bank, with whom I had established a long-term relationship of trust and confidence. At his suggestion, I contacted the Defendant, DAVIS, who subsequently became my account executive. I relied upon the expertise of the Defendant, DAVIS, and trusted him especially since he was recommended to me by my bank manager.

3. Prior to signing the subject account Agreement, the Defendant, DAVIS, individually and as an employee of the Defendant, MERRILL LYNCH, did not advise me that said agreement contained a "boiler plate" arbitration clause.

4. At the time that I executed the account Agreement, I merely believed that I was signing a document which enabled me to open an account with the defendant, MERRILL LYNCH.

**3.** The arbitration clauses are not hidden in the documents; indeed, they are but one of only ten

5. The Defendant, DAVIS, individually and as an employee of the Defendant, MERRILL LYNCH, also did not advise me that by consenting to submit all controversies to arbitration, I was waiving: (1) all legal rights to resolve any dispute or controversy arising out of my account through trial by jury; (2) all legal rights to obtain punitive damages in the event that any dispute was submitted to arbitration; and (3) my legal rights to appeal and to conduct extensive discovery since these rights are severely limited in an arbitration proceeding.

6. The Defendant, DAVIS, individually and as an employee of the Defendant MERRILL LYNCH, did not provide me with any literature regarding arbitration and waiver of judicial remedies either prior to or subsequent to obtaining my signature on the account Agreement.

7. I would not have signed the form account Agreement had I known the true nature and content of the arbitration provision contained in that agreement.

8. I did not receive any additional consideration or benefit from the Defendants in exchange for my signature and assent to the arbitration clause.

FURTHER AFFIANT SAYETH NOT.

_____

SELMA BOYD

SWORN TO and subscribed before me this 27 day of June, 1985.

### AFFIDAVIT

BEFORE ME, the undersigned authority personally appeared DR. KENNETH BLAZE, who after being duly sworn deposes and states as follows:

1. I was the Plaintiff, SELMA BOYD'S, physician during 1979 to 1984.

2. Throughout said time period, the Plaintiff was taking certain hypnotic drug(s) for chronic insomnia.

or twelve short paragraphs in the agreements.

3. The possible side-effects of the medication, which the Plaintiff was taking, were impairment of memory and confusion. In that state, the Plaintiff could have been easily manipulated or induced to commit an act since her inhibitions were reduced.

FURTHER AFFIANT SAYETH NOT.

# APPENDIX B

**Merrill Lynch**
**Pierce Fenner & Smith Inc.**

*1243*

**STANDARD OPTION AGREEMENT**

Gentlemen:

In connection with any transactions executed by you on my behalf for the purchase and sale of put and call options I agree as follows:

1. All transactions shall be subject to the constitution, rules, regulations, customs, and usages of the exchange, or market and its clearing house, if any, where executed. I further agree that I will not, either alone or in concert with others, violate the position or exercise limits which the Exchanges or marketplace where executed, may establish from time to time as set forth in the prospectus of the Options Clearing Corporation.

2. In the case of options sold or written by me in a cash account:

   (a) With respect to a call option which if exercised against me will require the delivery of securities sold, I will keep such securities in my account with you until the expiration of the option period, and will not sell or withdraw such securities. If the option is exercised you may deliver such securities to the purchaser without previous notice to me.

   (b) With respect to any put option which if exercised against me will require payment for securities purchased, I will keep in my account sufficient funds for such payment until the expiration of the option period, and will not withdraw such funds or utilize them for any purpose. If the option is exercised you may use such funds for the purchase of such securities without previous notice to me.

3. Any securities and funds held by you in any account of mine with you shall be held by you as security for the performance by me of my obligations to you under this agreement.

4. I understand that I should not purchase an option unless I am able to sustain a total loss of the premium and transaction costs, and I should not write a call option unless I either own the underlying security (or a security convertible, exchangeable, or exercisable into such underlying security) or am able to sustain substantial financial losses, and that I should not write a put option unless I am able to sustain substantial financial losses.

5. I have been advised of and agree to abide by your policies and federal regulations regarding margining of options and related transactions.

6. I agree to advise you of any changes in my financial situation and needs, experience, or investment objectives.

7. In case of my insolvency, death or attachment of my property, you may, with respect to any pending options, take such steps as you consider necessary to protect yourself against loss.

8. Any agreement by me with you, whether previously or hereafter made applicable to any account of mine with you, shall also apply to such option transactions, except to the extent which it conflicts with this agreement. In the event of a conflict, this agreement shall control, and where there is no conflict, each provision of each agreement shall apply.

9. Any controversy between us arising out of such option transactions or this agreement shall be settled by arbitration before the National Association of Securities Dealers, Incorporated, or the New York Stock Exchange, or an Exchange located in the United States upon which listed options transactions are executed, only. I shall have the right of election as to which of the foregoing tribunals shall conduct the arbitration. Such election is to be by registered mail, addressed to Merrill Lynch's head office at 165 Broadway, New York, N.Y. 10006, attention of the Law Department. The notice of election is to be postmarked within five days after the date of your demand to make such election. At the expiration of the five days I hereby authorize Merrill Lynch to make such election on my behalf.

10. This agreement and its enforcement shall be governed by the laws of the State of New York.

Dated: ___9/4/80___    Signature(s) of Customer(s) _Selma Boyd_

Customer Account Number: _738-33834_

MRS SELMA BOYD
1421 NW 119 AV
FLORIDA PINES, FL 33026    CMA

9/61/69

OFFICE COPY

CODE 245 REV 6/77 PRINTED IN U S A

946

PERSONAL AND FINANCIAL DATA FURNISHED BY CUSTOMER

**T NUMBER** 738 . 96-21

**R'S NAME** SELMA BOYD

**ADDRESS**

| STATE | ZIP CODE |
|---|---|

| BIRTH | NO. OF DEPENDENTS | HOME PHONE NUMBER |
|---|---|---|

| RY EMPLOYER | RETIRED ☐ | BUSINESS PHONE NO. |
|---|---|---|

NAME (IF APPLICABLE)

STENCIL: 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   4370   330-96021   NRS SELMA BOY   CMB

**S AF OXIMATE ANNUAL EARNINGS**

$25, - STATE AMOUNT _____

0 - $50,000   ☐ $50,000 - $100,000   ☐ OVER $100,000

**APPROXIMATE INCOME (IF APPLICABLE)**  $

**TOTAL ANNUAL INCOME FROM ALL SOURCES**  $

| | CASH  $ |
|---|---|
| STOMER'S | SECURITIES  $ |
| LIQUID | |
| ASSETS | TOTAL LIQUID ASSETS  $ |

**R ASSETS UITY IN HOME)**  $

**STOMER'S OXIMATE WORTH**  $

**REQUIRED DOCUMENTS**

| N C RING CORP. PROSPECTUS & LEA S PROVIDED TO CUSTOMER | DATE |
|---|---|

ATTORNEY NAME OF AGENT
☐ GENERAL

108 HYPOTHECATION CONSENT FORM SIGNED BY CUSTOMER (MARGIN ACCOUNT ONLY)

**DECLARATIONS**

**INVESTMENT OBJECTIVES**

☒ INCOME   ☐ TRADING   ☒ SPECULATION

DOES CUSTOMER HAVE RESTRICTED STOCK?  ☐ YES  ☒ NO
IS CUSTOMER A CONTROL PERSON?  ☐ YES  ☒ NO

(IF YES, SHARES OF RESTRICTED STOCK OR STOCK HELD BY A CONTROL PERSON, EXCEPT TO THE EXTENT SALABLE UNDER RULE 144, MAY NOT BE USED TO COVER A SHORT POSITION IN CALL OPTION CONTRACTS, SATISFY MARGIN REQUIREMENTS OR BE DELIVERED AGAINST EXERCISE OF A PUT OR CALL OPTION.)

**TYPE OF OPTION TRADING DESIRED**

☐ BUY CALLS   ☐ BUY PUTS   ☒ SPREADS

☒ WRITE CALLS:   ☒ WRITE PUTS   ☒ COMBINATIONS (STRADDLES, ETC.)
☒ COVERED
☐ UNCOVERED

**LIST ACCOUNTS WITH OTHER FIRMS**

1. NONE

2. NONE

**CHECK ALL INVESTMENT EXPERIENCES THAT APPLY**

☐ OPTIONS  1  YRS.   ☐ STOCK ____ YRS.   ☐ BONDS  2  YRS.

☐ COMMODITIES ____ YRS.   ☐ OTHER (SPECIFY) ____ YRS.

**PRIOR TRADING ACTIVITY**

☐ SELDOM   ☐ MODERATE   ☒ ACTIVE

**APPROVALS**

TO BE COMPLETED BY OFFICE MANAGER PRIOR TO OPTION TRADING

ROVED FOR OPTION TRADING AS FOLLOWS:

| CALLS | ☐ BUY PUTS | ☒ SPREADS |
|---|---|---|
| YE CALLS: COVERED UNCOVERED | ☒ WRITE PUTS | ☒ COMBINATIONS (STRADDLES, ETC.) |

| ACCOUNT EXECUTIVE'S SIGNATURE | DATE  3/26/81 |
|---|---|
| MANAGER'S SIGNATURE (MUST BE R.O.P. & OFFICER) | DATE  3/26/ |
| REGISTERED OPTION PRINCIPAL'S SIGNATURE (IF OTHER THAN MANAGER, MUST BE OFFICER) | DATE |

V. 1 81  PRTD. IN USA   A'S COPY

Gentlemen:

In connection with any transaction executed by you on my behalf for the purchase and sale of put and call options, I agree as follows:

1. All transactions shall be subject to the constitution, rules, regulations, customs, and usages of the exchange, or market and its clearing house, if any, where executed. I further agree that I will not, either alone or in concert with others violate the position or exercise limits which the Exchanges or marketplace where executed, may establish from time to time as set forth in the prospectus of the Options Clearing Corporation ("OCC").

2. In the case of options sold or written by me in a cash account:

   (a) With respect to a call option which if exercised against me will require the delivery of securities sold, I will keep such securities in my account with you until the expiration of the option period, and will not sell or withdraw such securities. If the option is exercised, you may deliver such securities to the purchaser without previous notice to me.

   (b) With respect to any put option which if exercised against me will require payment for securities purchased, I will keep in my account sufficient funds for such payment until the expiration of the option period, and will not withdraw such funds or utilize them for any purpose. If the option is exercised you may use such funds for the purchase of such securities without previous notice to me.

3. Any securities and funds held by you in any account of mine with you shall be held by you as security for the performance by me of my obligations to you under this agreement.

4. As option transactions involve a high degree of risk, I understand that:

   (a) I should not purchase an option unless I am able to sustain a total loss of the premium and transaction costs, and I should not write a call option unless I either own the underlying security (or a security convertible, exchangeable, or exercisable into such underlying security) or am able to sustain substantial financial losses, and that I should not write a put option unless I am able to sustain substantial financial losses.

   (b) I may not be able to close a position in the event that a secondary market in the option ceases to exist or the listing exchange restricts or suspends trading in the option.

5. I have been advised of and agree to abide by your policies and federal regulations regarding margining of options and related transactions.

6. I agree to advise you of any changes in my financial situation and needs, experience, or investment objectives.

7. In case of my insolvency, death or attachment of my property, you may, with respect to any pending options, take such steps as you consider necessary to protect yourself against loss.

8. Any agreement by me with you, whether previously or hereafter made applicable to any account of mine with you, shall also apply to such option transactions except to the extent which it conflicts with this agreement. In the event of a conflict, this agreement shall control, and where this is no conflict, each provision of each agreement shall apply.

9. Any controversy between us arising out of such option transactions or this agreement shall be settled by arbitration only before the National Association of Securities Dealers, Incorporated, or the New York Stock Exchange, or an Exchange located in the United States upon which listed options transactions are executed. I shall have the right of election as to which of the foregoing tribunals shall conduct the arbitration. Such election is to be by registered mail, addressed to Merrill Lynch's head office at 165 Broadway, New York, N.Y. 10080, attention of the Law Department. The notice of election is to be postmarked five days after the date of your demand to make such election. At the expiration of the five days, I hereby authorize Merrill Lynch to make such election on my behalf.

10. I understand that exercise assignment notices for option contracts are allocated among customer short positions in accordance with the date of the transaction which established the short position. Positions which were established earliest will be assigned first ("First-In, First-Out"). A more detailed description of MLPF&S's allocation procedure is available upon request.

11. Absent the written designation of an agent to transact business on my behalf (power of attorney), I alone may make trading decisions in my account; however, unless I give specific instructions to the contrary, you may exercise discretion in the selection of the exchange or marketplace for the execution of dually traded options.

12. This agreement and its enforcement shall be governed by the laws of the State of New York.

I (WE) HAVE RECEIVED AND READ A CURRENT OPTION CLEARING CORPORATION PROSPECTUS AND ARE AWARE OF THE SPECIAL RISKS ATTENDANT TO OPTION TRADING. THE STATEMENTS CONTAINED ON THIS FORM ARE ACCURATE.

CUSTOMER'S SIGNATURE    DATE SIGNED     SPOUSE'S SIGNATURE (REQUIRED FOR JOINT ACCOUNTS)    DATE SIGNED

## APPENDIX C

**§ 240.15c2–2  Disclosure regarding recourse to the courts notwithstanding arbitration clauses in broker-dealer customer agreements.**

(a) It shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising under the Federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer.

(b) Notwithstanding paragraph (a) of this section, until December 31, 1984 a broker or dealer may use existing supplies of customer agreement forms if all such agreements entered into with public customers after December 28, 1983 are accompanied by the separate written disclosure:

Although you have signed a customer agreement form with FIRM NAME that states that you are required to arbitrate any future dispute or controversy that may arise between us, you are not required to arbitrate any dispute or controversy that arises under the federal securities laws but instead can resolve any such dispute or controversy through litigation in the courts.

(c) A broker or dealer shall not be in violation of paragraph (a) of this section with respect to any agreement entered into with a public customer prior to December 28, 1983 if:

(1) Any such public customer for whom the broker or dealer has after July 1, 1983 (i) carried a free credit balance, or (ii) held securities for safekeeping or as collateral, or (iii) effected a securities transaction is sent, no later than December 31, 1984, the disclosure prescribed in paragraph (b) of this section; or

(2) Any other public customer is sent upon the completion of his next transaction pursuant to such agreement, the disclosure prescribed in paragraph (b) of this section.

(Secs. 2, 10, 15, 23 and 29 thereof (15 U.S.C. 78b, 78j, 78o, 78w and 78cc)

[48 FR 53406, Nov. 28, 1983]